**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X

DMITRY SHARIN and GREAT CENTRAL
TRANSPORT, INC.,

                Plaintiffs,

  -against-

QFS CAPITAL LLC,

                Defendant.

------------------------------------------------------------------ X

Case No. 26-cv-1706

**COMPLAINT**

      Plaintiffs Dmitry Sharin ("Sharin") and Great Central Transport, Inc. ("GCT") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby allege as follows:

**PARTIES**

    1.    Plaintiff Dmitry Sharin ("Sharin") is an individual residing at 4341 Redwood Ave, Suite 5, Marina Del Rey, California 90220. Sharin is the President and principal of Plaintiff Great Central Transport, Inc.

    2.    Plaintiff Great Central Transport, Inc. ("GCT") is a California corporation engaged in transportation and logistics operations. Its principal place of business was formerly located at 737 W Artesia Blvd, Compton, California 90220, but relocated in September 2025 to its current operating address at 601 W. Walnut Street, Compton, California 90220.

    3.    Defendant QFS Capital LLC ("QFS" or "Defendant") is a Delaware limited liability company registered as a foreign corporation in the States of New York and Florida, with its principal place of business located at 110 E. Broward Blvd., Ste 1550, Fort Lauderdale, Florida 33301-3553. Its registered agent is Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904.

1

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts regular business within this District and the Agreement at issue contains New York forum-selection and governing-law provisions.

**NATURE OF THE ACTION**

6. This civil action asserts claims for breach of contract, intentional interference with business relationships, and breach of the implied covenant of good faith and fair dealing, arising from Defendant's operation of a disguised, usurious loan instrument marketed as a "Merchant Agreement for the Purchase and Sale of Future Receipts."

7. Although labeled as a receivables-purchase agreement, the transaction functioned as a high-interest loan with fixed, non-contingent repayment obligations. Defendant required weekly remittances of $49,436.96, regardless of GCT's actual receivables, resulting in the agreement functioning economically as a loan. Defendant bore no risk of non-payment, failed to conduct meaningful reconciliation, and exercised unilateral control over withdrawals, which are hallmarks of a loan rather than a true purchase of receivables.

8. Defendant, acting through its executives, officers, and agents, engaged in a sustained pattern of misconduct that exceeded any rights conferred by the Agreement. This conduct included: (i) unilaterally suspending contractually committed funding; (ii) altering payment terms without the written amendment mandated by the Agreement; (iii) manufacturing a false default; (iv) initiating unauthorized withdrawals; and (v) disseminating Plaintiffs'

confidential financial and personal information to third parties. Defendant further interfered with Plaintiffs' customer relationships by issuing false default notices, directing customers to divert payments, and misusing a UCC-1 filing to exert improper leverage and that contained sensitive personal data.

9. Defendant's actions caused severe and immediate harm to Plaintiffs' business operations, customer relationships, creditworthiness, and ability to maintain essential commercial facilities, ultimately resulting in millions of dollars in damages.

## FACTUAL ALLEGATIONS

**A.** **The Agreement**

10. On or about April 2, 2025, Plaintiffs and Defendant entered into a written agreement titled "Merchant Agreement for the Purchase and Sale of Future Receipts," assigned contract #7243 (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A.

11. The Agreement provided for a "Maximum Purchased Amount" of $1,997,791.77 in exchange for a "Maximum Purchase Price" of $1,359,042.00. After origination fees, the "Maximum Net Funded Amount" to be dispersed to GCT was $1,291,089.94.

12. Plaintiff executed the Agreement after Defendant's underwriters represented that the transaction was not a traditional loan and the purchase amount would not be provided upfront.

13. Under the terms of the Agreement, QFS was required to deploy funds to GCT in a series of installments ("Deployments") each Monday in the amount of $67,261.17. In exchange, GCT was required to remit weekly payments on Friday in the amount of $49,436.96.

14. The Agreement imposed strict limitations on Defendant's ability to suspend funding, modify payment terms, or declare a default. Specifically, the Agreement restricts how and

3

when Defendant may suspend funding, modify payment terms, or exercise remedies. Sections 14 and 15 of the Agreement required that any modifications or amendments be made in writing and signed by all parties.

**B.     The Transaction Functioned as a Loan**

15.    Despite its form, the Agreement operated as a loan because repayment was fixed, unconditional, and not contingent on GCT's actual receivables. Defendant bore no risk of non-payment, failed to conduct meaningful reconciliation, and exercised unilateral control over withdrawals. These features rendered the Agreement a disguised loan subject to New York's civil and criminal usury laws.

**C.     Defendant's Unauthorized Modifications and Suspensions**

16.    On or about July 1, 2025, Defendant unilaterally altered the payment schedule from weekly to daily debits, without obtaining the required written amendment or Plaintiffs' consent, in direct violation of Sections 14 and 15 of the Agreement.

17.    On or about July 7, 2025, Defendant ceased funding without issuing a contractual notice of default, without a written amendment, and despite Plaintiffs continued remittances.

**D.     Unauthorized Withdrawal Attempts and Banking Disruptions**

18.    On August 30, 2025, which was a Saturday and the beginning of a 3-day holiday weekend due to Labor Day, Defendant attempted to withdraw $9,886.00 from Plaintiffs' bank account. This attempt violated the Section 4 of the Agreement, which requires that any withdrawal scheduled for a non-business day be processed on the "next business day." As Labor Day fell on Monday, September 1, 2025, the next business day was Tuesday, September 2, 2025. Defendant's attempt to debit Plaintiffs' account on August 30 therefore violated the Agreement's express timing requirements.

19. Defendant falsely claimed it was entitled to withdraw on holidays "as per contract, as well as notice sent," despite Plaintiffs never receiving any such notice.

20. Between September 2, 2025 and September 5, 2025, Defendant attempted additional non-compliant debits, causing "Payment Stopped by Receiver" notices, which further destabilized Plaintiffs' banking relationship.

**E.  Plaintiffs' Performance**

21. Plaintiffs substantially performed under the Agreement. By September 2025, Plaintiffs had remitted $746,498.23 to Defendant, exceeding the $736,706.05 funded by Defendant prior to its suspension of deployments. Following these remittances, the parties engaged in discussions concerning reconciliation of the account and disputed charges.

**F.  Defendant's Failure to Provide Contractually Required Notices**

22. Defendant did not issue a formal written notice of default or acceleration as required by the Agreement.

23. Instead of providing the written notice required by the Agreement, Defendant initiated direct communications with Plaintiffs' customers and third parties, bypassing the Agreement's enforcement procedures.

24. None of Defendant's communications identified themselves as a contractual "Notice of Default," invoked default provisions, or provided a cure period.

25. Defendant's communications consisted solely of payment demands and negotiation discussions and did not constitute a contractual notice of default under the Agreement. Defendant did not provide any written notice that complied with the Agreement's notice provisions before altering payment terms, suspending funding, or contacting third parties regarding payment.

26.     Even assuming a payment default had occurred, the Agreement required Defendant to follow specific contractual procedures before exercising any enforcement remedies against third parties. Defendant did not follow those procedures. None of Defendant's communications identified themselves as a contractual "Notice of Default," invoked the Agreement's default provisions, stated a cure period, or otherwise complied with the Agreement's express notice requirements.

27.     During these communications, Defendant's agent stated that Defendant would pursue UCC filings and personal legal action initiated personally by QFS's agent against Plaintiffs despite ongoing reconciliation discussions. Defendant's conduct exceeded any permissible effort to preserve collateral and instead sought to pressure Plaintiffs by impairing ongoing business operations.

**G.     Improper Customer Contact and False Default Notices**

28.     Beginning on September 23, 2025, Defendant, acting through its executives, officers, and agents, including Benjamin Hinke (CFO), Robert Rampulla (Senior Servicing Manager), Jasmina Llukaj, Megi Saliaj, and Erion M (AR Specialists), initiated direct and unauthorized communications with Plaintiffs' customers concerning alleged payment redirection. These communications were transmitted by telephone, email, and/or fax to numerous customers across GCT's active client base. A true and correct copy of certain communications are attached as Exhibit B.

29.     Defendant undertook this outreach without issuing any contractual written notice of default, without identifying a cure period, and while the parties were actively negotiating reconciliation discussions concerning the disputed balances. Defendant contacted GCT's customers directly, including Bioworld Merchandising, Polo 4PL, The Block Logistics, NU Health

Foods Inc, Armada, Maverick, Pasha Logistics, Solid Build, TForce, and others. Defendant asserted that Plaintiffs were in default and demanded that customers withhold or redirect payments to QFS, despite the absence of any contractual default and despite Plaintiffs' remittances exceeding the net funded principal.

30. Defendant contacted multiple GCT customers, including Bioworld Merchandising, Polo 4PL, The Block Logistics, NU Health Foods, Armada, Maverick, Pasha Logistics, Solid Build, TForce, and others. Defendant's communications were not limited to identifying specific receivables but instead constituted a broad campaign directed at numerous business parties, including inactive accounts and customers with no outstanding balance. Defendant relied on outdated April 2025 accounts receivable information and transmitted notices indiscriminately, creating the false impression that Plaintiffs were insolvent, in financial distress, or unable to perform.

31. In doing so, Defendant materially breached the confidentiality provisions of Section 20 of the Agreement. Defendant disclosed Plaintiff's confidential and proprietary information, including bank account numbers, Federal Tax ID numbers (EIN), and residential addresses, and transmitted copies of the Agreement and alleged default notices to general email inboxes (e.g. info@ and hello@...) and lower level employees at customer companies that had been scraped from customer websites or other social media platforms.

32. Defendant's communications were not made to collect specific existing receivables but instead were sent indiscriminately to unrelated third parties and customers with no outstanding balance. These communications were therefore outside the scope of any notice authorized under Article 9 and had the natural and foreseeable effect of disrupting Plaintiffs' customer relationships.

33. Defendant's interference caused immediate and catastrophic harm. Bioworld Merchandising suspended its account with GCT after its VP of Supply Chain described Defendant's notice as "alarming." Polo 4PL froze approximately $29,712 in payments and terminated its relationship with GCT, stating explicitly: "*Had we been made aware of your current financial position, we would not have entrusted any shipments to your company.*"

34. On January 2, 2026, TForce remitted $121,133.18 to Defendant instead of GCT as a direct result of repeated phone calls and mass email communications from Defendant directing customers to redirect payments. Other customers, including Solid Build and Maverick, also froze payments after learning of the UCC filing against GCT.

35. As a result of Defendant's conduct, GCT lost control of its cash flow, triggering a cascading operational impact and impairing its ability to meet payroll, service its Small Business Administration loan, and make required lease payments. These disruptions occurred while Plaintiffs continued operating and attempting to resolve the disputed balance.

36. Prior to Defendant's communications, these customers maintained an ongoing relationship with Plaintiffs and were current on payments. The suspensions, freezes, and terminations occurred only after Defendant's improper communications and had not occurred at any time prior during the parties' performance.

H.  **Misuse of UCC Filing and Disclosure of Personal Information**

37. On April 8, 2025, Defendant filed a UCC financing statement with the California Secretary of State that identified Sharin and his partner Artyom Drey by their personal names and residential addresses in connection with the alleged commercial obligation. The filing publicly associated Plaintiffs with an asserted debt obligation despite the absence of any contractual default and even though the parties were performing under the Agreement at that time.

38. After receiving remittances that exceeded the net funded principal, Defendant continued to maintain, rely upon, and disseminate the filing while simultaneously asserting a default and engaging in collection activity. Defendant invoked the filing during its September 2025 outreach to GCT customers, using it as a coercive device to create the false impression that Plaintiffs were subject to a legally established default and that Defendant possessed immediate enforcement rights against customer payments.

39. Defendant's use of the UCC filing exceeded any legitimate purpose permitted under Article 9. The filing contained sensitive personal information, including residential addresses, and Defendant transmitted or referenced this information in communications to third parties. Defendant's conduct was undertaken not to preserve collateral or secure specific receivables, but to exert pressure on Plaintiffs, impair their business relationships, and coerce payment of disputed amounts.

40. The public nature of the filing caused immediate reputational harm. In November 2025, Sharin received unsolicited communications from Business Term Negotiators LLC referencing the personal UCC lien. This demonstrated that Defendant's filing of sensitive personal data had entered the marketplace and was being used by third parties to target Plaintiffs as distressed debtors. The resulting reputational injury was a direct and foreseeable consequence of Defendant's misuse of the filing.

41. Defendant's continued assertion of default, its refusal to withdraw or amend the UCC filing, and its reliance on the filing in communications with customers materially contributed to the disruption of Plaintiffs' customer relationships, the freezing of payments by multiple customers, and the deterioration of Plaintiffs' creditworthiness. The filing, combined with Defendant's direct customer outreach, created the appearance that Plaintiffs were insolvent or

unable to perform, which caused customers to suspend or terminate ordinary business dealings with GCT.

## I.     Resulting Business Collapse and Damages

42.    GCT maintained a 200,000 square foot long-term commercial lease with Prologis, L.P. for warehouse premises essential to its transportation and logistics operations. Defendant's conduct, including its misuse of the UCC filing and its interference with customer receivables, materially disrupted GCT's cash flow and impaired its ability to continue performing under the lease.

43.    During October and November 2025, Plaintiff Sharin continued efforts to resolve the disputed balance and stabilize operations. Defendant initially proposed an $8,500 weekly payment plan, but subsequently denied having made that offer, claiming in writing that "no such proposal was ever made" even though the offer appeared in the same email chain.

44.    At the same time, Defendant issued a formal draft agreement demanding weekly payments of $10,000, contradicting its prior offer. GCT countered based on the previous conversations. Defendant refused and continued contacting customers directly by phone and email despite acknowledging earlier that no client remittance requests had been made.

45.    In that correspondence, a QFS representative wrote: "We have not requested any of your clients to remit funds to us. We will release everything back to you once the 1st payment is received.".

46.    Shortly thereafter, Defendant issued a second contradictory message stating: "As you are aware, we are placing a lot of your accounts on hold. We will continue doing so, and we will escalate collection efforts if this remains unresolved." This escalation occurred while the

parties were still engaged in reconciliation discussions and while Plaintiffs had already remitted amounts exceeding the net funded principal.

47. On December 15, 2025, following the financial instability caused by Defendant's customer payment diversion campaign and the resulting collapse of GCT's operating cash flow, Prologis issued an "Amendment to Lease for Early Lease Termination" relating to GCT's warehouse premises.

48. The termination required surrender of the premises and imposed an approximately $3.78 million termination obligation payable over an extended period. This liability arose from the revenue collapse caused by Defendant's interference with GCT's receivables and customer relationships.

49. As a direct result of Defendant's conduct, GCT and Sharin suffered damages estimated between $12 million and $15 million, including lost customer revenue exceeding $6.5 million, the approximately $3.78 million lease termination liability, ongoing obligations under GCT's $2.1 million SBA loan financing, and severe and continuing reputational harm.

50. Plaintiffs' damages are not limited to the disputed contractual balance but arise from the loss of ongoing business relationships, interruption of operations, and destruction of goodwill caused by Defendant's conduct toward third parties. The loss of customers resulted from Defendant's communications rather than any inability of Plaintiffs to perform services.

## COUNT I
## BREACH OF CONTRACT

51. Plaintiffs incorporate and reallege paragraphs 1 through 50 as if fully set forth herein.

52. A valid and enforceable contract (the Agreement) existed between the Plaintiffs and Defendant in the form of the Merchant Agreement for the Purchase and Sale of Future Receipts.

Plaintiffs substantially performed all obligations under the Agreement, including remitting amounts that exceeded the net funded principal.

53. Defendant materially breached the Agreement in multiple instances, including but not limited to:

   a. Wrongful Withholding: Unilaterally withholding scheduled funding deployments between June 20 and June 25, 2025, in violation of the Deployment Schedule;

   b. Unauthorized Modification: Unilaterally altering the payment terms from weekly to daily debits on July 1, 2025, without the written amendment required by Section 14 and 15 of the Agreement;

   c. Unauthorized Banking Activity: Attempting unauthorized withdrawals on non-business days (August 30, 2025) in violation of Section 4;

   d. Breach of Confidentiality: Disseminating Plaintiffs' confidential financial and personal data to third parties in violation of Section 20; and

   e. Failure to Reconcile: Refusing to perform the required reconciliation of the remittance amount pursuant to Section 6 of the Agreement despite Plaintiff's payment existing the amount funded prior to enforcement activity amount.

   f. Initiating Third Party Collection: Initiating third party collection activity without issuing the contractual notice of default or identifying a cure period as required by the Agreement.

54. As a direct and proximate result of Defendant's breaches, Plaintiffs suffered monetary damages in an amount to be proven at trial, but estimated to exceed $12,000,000.00, including lost customer revenue, the Prologis lease termination liability, ongoing Small Business Administration loan obligations, and severe reputational harm.

WHEREFORE, under Count I, Plaintiffs respectfully request that this Court enter judgement in their favor and against Defendant QFS Capital LLC, awarding:

a. Compensatory damages in an amount to be determined at trial;

b. Prejudgment and post-judgment interest at the statutory rate;

c. Reasonable attorney's fees and costs pursuant to the Agreement and applicable law; and

d. Such other and further relief as the Court deems just and proper.

## COUNT II
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

55. Plaintiffs incorporate and reallege paragraphs 1 through 54 as if fully set forth herein.

56. At all relevant times, GCT maintained active contractual and prospective business relationships with multiple customers, including Bioworld Merchandising, Polo 4PL, The Block Logistics, and NU Health Foods.

57. Defendant had actual knowledge of these relationships, as evidenced by its possession and use of GCT's customer lists and Accounts Receivable data.

58. Defendant intentionally and unjustifiably interfered with these relationships by:

a. Sending false and misleading "default notices" to customers, including inactive accounts and customers with no outstanding balance;

b. Demanding that customers withhold or redirect payments to Defendant despite the absence of any contractual default;

c. Disclosing Plaintiffs' confidential financial and personal information to lower level employees and general email addresses at these companies;

  d. Relying on outdated April 2025 Accounts Receivable information to assert false payment obligations; and

  e. Creating the false impression that Plaintiffs were insolvent or unable to perform services.

59. Defendant's conduct was improper, malicious, and exceeded any legitimate economic interest or contractual right. Defendant's agents, including Benjamin Hinke (CFO), engaged in this conduct with the specific intent to impair Plaintiffs' business reputation and coerce payment of disputed amounts.

60. Defendant's interference caused the suspension, freezing, disruption and termination of customer relationships. Specifically, (i) Bioworld Merchandising suspendeing its account, (ii) Polo 4PL terminating its contract and withholding funds, citing Defendant's communications as the sole reason, and (iii) the diversion of $129,133.18 from TForce to QFS.

61. As a direct and proximate result of Defendant's intentional interference, Plaintiffs have suffered substantial damages including lost profits, lost goodwill, destruction of business value, and the collapse of GCT's operating cash flow.

WHEREFORE, under Count II, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant QFS Capital LLC, awarding:

  a. Compensatory damages for lost revenue, lost profits, and loss of business value in an amount to be determined at trial;

  b. Punitive damages in an amount sufficient to punish Defendant and deter similar future misconduct, given the intentional and malicious nature of the acts;

  c. Preliminary and permanent injunctive relief prohibiting further interference with Plaintiffs' customers and business relationships; and

    d.  Such other and further relief as the Court deems just and proper.

## COUNT III
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

62. Plaintiffs incorporate and reallege paragraphs 1 through 61 as if fully set forth herein.

63. Under New York law, every contract contains an implied covenant of good faith and fair dealing, which prohibits a party from acting in a manner that deprives another party of the right to receive the fruits of the contract.

64. Defendant breached this implied covenant by exercising its discretionary powers in bad faith. Specifically, Defendant:

    a.  Used its discretion over funding deployments to withhold capital capriciously to starve Plaintiffs' cash flow;

    b.  Manufactured a false "default" based on temporary balances that Defendant's own withholding helped create;

    c.  Misused the UCC filing system and customer notices to exert pressure on Plaintiffs' private data, coerce payment of usurious fees, and create the false appearance of insolvency;

    d.  Altered payment terms without a written amendment;

    e.  Contacted customers directly to divert payments and disrupt Plaintiffs' business operations; and

    f.  Issued contradictory statements regarding customer remittance requests to conceal its conduct.

65. Defendant's conduct deprived Plaintiffs of the primary benefit of the bargain, including access to working capital and the ability to continue operating their business in the ordinary course.

66. As a direct and proximate result of Defendant's breach of the implied covenant, Plaintiffs suffered damages distinct from the breach of express contract terms, including the collapse of their creditworthiness, the loss of their primary warehouse lease, and the destruction of goodwill and business value.

WHEREFORE, under Count III, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant QFS Capital LLC, awarding:

   a. Compensatory damages for loss of goodwill, loss of creditworthiness, and destruction of business value in an amount to be determined at trial;

   b. Prejudgment and post-judgment interest at the statutory rate;

   c. Costs permitted by law; and

   d. Such other and further relief as the Court deems just and proper.

## **INJUNCTIVE RELIEF**

67. Plaintiffs incorporate and reallege paragraphs 1 through 66 as if fully set forth herein.

68. Defendant's conduct is not isolated or historical; it is ongoing and continues to inflict irreparable harm on Plaintiffs' business operations, creditworthiness, and ability to function as a going concern. Defendant has refused to terminate the UCC-1 filing, despite receiving remittances that exceeded the net funded principal, and continues to assert a default that has never been contractually established. Defendant has also threatened to escalate collection efforts and to

place additional customer accounts on hold, notwithstanding the absence of any contractual notice of default or cure period.

69. Defendant's continued assertion of default and its refusal to withdraw the UCC lien constitute a continuing improper use of the UCC lien filing as leverage during a disputed balance. The filing publicly associates Plaintiffs with an alleged financial distress event and continues to impair Plaintiffs' ability to obtain operating capital, maintain vendor relationships, and restore customer confidence. Money damages alone cannot remedy the ongoing reputational harm or the continuing threat to Plaintiffs' business viability.

70. Plaintiffs seek narrowly tailored injunctive relief to prevent further non-contractual enforcement conduct, including unauthorized customer contact, payment diversion demands, and improper assertions of default or lien rights, pending resolution of this matter.

71. Plaintiffs are likely to succeed on the merits of their claims, as evidenced by the banking records confirming remittances exceeding the net funded principal, Defendant's written admissions regarding customer remittance requests, and the documented pattern of contradictory statements and unauthorized outreach.

72. The balance of equities favors Plaintiffs. Plaintiffs face ongoing and potentially irreparable harm to their business operations and customer relationships, while Defendant seeks only to collect disputed amounts and has already disrupted Plaintiffs' ordinary course of business and threatens continuing loss of goodwill and revenue by Defendant's conduct (including directing customers to withhold or redirect payments without court authorization, disseminating financial information to third parties, contacting operational personnel rather than appropriate payment or legal contacts, and issuing broad notices that caused customers to suspend payments). The public

interest is served by preventing the misuse of commercial enforcement mechanisms and protecting businesses from coercive and unlawful collection practices.

WHEREFORE, Plaintiffs respectfully request that this Court issue a Preliminary and Permanent Injunction:

    a. Enjoining Defendant, its agents, representatives, and affiliates from contacting any of Plaintiffs' customers or vendors regarding alleged payment diversion or default;

    b. Enjoining Defendant from asserting a default to any third party that Plaintiffs are in default under the Agreement;

    c. Ordering Defendant to immediately file a UCC-3 Termination Statement releasing the lien on Plaintiffs' assets;

    d. Ordering Defendant to cease all collection activity pending the final adjudication of this matter; and

    e. Granting such other and further equitable relief as the Court deems just and proper.

Respectfully submitted:

s/ Jeffrey A. Lindenbaum
Jeffrey A. Lindenbaum (JL-1971)
PRACTUS, LLP
100 South Bedford Road, Suite 328
Mount Kisco, New York 10549
914-941-5668
Jeffrey.lindenbaum@practus.com
WCDocket@practus.com

-and-

Mark. D. Belongia *(Pro Hac Vice to Follow)*
William R. Firth, III *(Pro Hac Vice to Follow)*
Jawwad Khan *(Pro Hac Vice to Follow)*

*Attorneys for Plaintiff Dmitry Sharin & Great Central Transport, LLC*

Dated: March 2, 2026